LEMMON, Judge.
Plaintiff, a real estate broker, has appealed from a judgment which denied his claim for a broker’s commission.
On November 20, 1972 defendants executed a standard form listing agreement, employing plaintiff to sell their home situated on an 18-acre farm on the Mississippi River (including all furnishings and equipment) for $200,000.00. Plaintiff paid $400.00 as consideration for this one-month agreement, which also gave plaintiff the right to renew the contract upon additional payments. By payments under the contract and subsequent amendments, plaintiff maintained the agreement in effect through June 20, 1973.
*642 On June 6, 1973 plaintiff secured a prospective purchaser who executed an option to purchase the property for $185,000.00. Defendants executed their acceptance of the option on the same day.
Also on the same day a section of the levee behind defendants’ home collapsed into the river, causing the threat of a serious levee break. Shortly thereafter the Board of Levee Commissions of the Orleans Levee District (Board) appropriated a servitude on defendants’ entire property for the purpose of building a levee setback and digging a borrow pit in connection with the construction. Eventually, defendants sold the property to Board.
The principal issue in this litigation involves plaintiff’s demand for a commission under the listing agreement on that sale.[1] Resolution of this issue requires an understanding of the events and procedures which led up to the sale in question.
Immediately after the levee problem manifested itself, the U. S. Army, Corps of Engineers (Corps), designed a levee setback and investigated the property needs. On June 9 Edward Crabtree of the Corps’ land acquisition department contacted defendants about the probable need for their vacating the property and discussed their rights as property owners. In the meantime appraisers from the Corps began evaluating the properties over which servi-tudes would probably be required.[2]
By June 11 the Corps determined that servitudes were required on portions of four parcels of property (including a portion of defendants’) for locating the levee setback, as well as a servitude on the remainder of defendants’ property for digging a borrow pit in connection with the levee construction. In accordance with standard procedure, the Corps communicated these needs to the Levee Board, who then became responsible to acquire the servitudes under the Board’s constitutional power of appropriation.[3]
Defendants, the only owners to be physically dispossessed by the proposed construction, met the next day with Board representatives. Defendants were informed that while the Board could only pay them the assessed value of the property, the Corps would appraise the property and pay full market value to the Board, who in turn were required to pay defendants the entirety of these funds. Defendants were also advised that preliminary appraisal data indicated the Corps would pay in the range of $180,000.00 to $182,000.00 for the servitude on their property, but that the amount ultimately paid would not be determined until the Corps’ appraisal was completed, reviewed and approved.
On June 13 the Board adopted a resolution of appropriation and formally notified the property owners. At the meeting plaintiff gave the Board written notice of the listing agreement and communicated his contention he was entitled to a commission on any deal agreed to during the existence of the contract.
On June 19 plaintiff tendered a payment to defendants in exercise of his right of renewal of the listing agreement for another month. Plaintiff also notified defendants he was ready, willing and able to fulfill his obligations under the listing agreement and to handle all negotiations pertaining to the sale of the property. Defendants refused to accept the renewal payment, and plaintiff filed this suit.
After vacating the premises, defendants received no further communication from the Board or the Corps until after August *643 14. On that date the Corps notified the Board that the servitude value of defendants’ property had been appraised at $182,500.00. At a meeting the next day, the Board adopted a resolution to accept this sum as full reimbursement for the servitude. Concurrently, the chief engineer recommended that the Board take full title to defendants’ property, rather than the servitude which had previously been contemplated, in order that the Board could fence and control the 15-acre pit and avoid tort liability problems. In accordance with this recommendation, but without discussion with defendants, the Board adopted a resolution to acquire full title to defendants’ property for a sum not to exceed $185,000.00. (The Board acquired only a servitude on the other three properties.) Without any negotiations, defendants agreed to accept this amount, and an act of sale was eventually passed.
The trial court denied the claim for the commission, holding that the emergency intervention of the public authority rendered the contract impossible to perform, requiring its nullification. We agree.
The listing agreement provided for a commission “on the gross amount of any deal (agreement to sell or exchange) that may be negotiated during the existence of this contract . . . . ” When the public necessity arose, the Board immediately appropriated a servitude on the entire property and constructed a levee on part and a borrow pit on the remainder. Thus, the thing which was the “object of the obligation”—that is, the land and improvements—became effectively destroyed and was rendered unsalable, and the contract was extinguished. C.C. art. 2219.
After the appropriation there was no “deal” for sale or exchange which could be negotiated, since the property and improvements were 100% damaged. Only the amount of compensation for the servitude remained to be determined, and the “present market value” was eventually appraised at $182,500.00.[4] At that point defendants theoretically could have kept title to the property and accepted that sum as compensation for the servitude and damages. However, the Board made an “interdepartmental decision”, without any discussion with defendants, to supply an additional $2,500.00 (for the Board’s own purposes) to make up the difference between the price the Corps was to reimburse the Board for the servitude and the price that defendants had indicated they would accept for title to the property. While plaintiff emphasizes in argument a statement by the Board’s chief engineer that the Board would not have paid $185,000.00 for the mere servitude, this interdepartmental decision came long after the property and improvements had been totally damaged by appropriation of the servitude, which was the only action originally contemplated by the Board. The fact that the Board used the formality of an act of sale to accomplish the incidental objective of avoiding tort liability did not serve to convert the original appropriation into a “deal” of sale as originally contemplated by the listing agreement. To determine otherwise would be to choose form over substance.
We conclude that no commission was due under the listing agreement, since all obligations under that contract became extinguished when the Board appropriated a servitude on the entire property for the levee and borrow pit.[5]
*644 The trial court also ordered the return of all cash and notes paid as consideration to acquire and extend the agreement, as well as the $400.00 check tendered on June 19, 1973 for extension of the contract. Defendants concede the fairness of this order, which in effect returns the parties to their status prior to the contract.
Defendants contest, however, that part of the judgment which awarded plaintiff $500.00, on a quantum meruit basis, for services performed in supplying the Corps’ appraisers with information and data to support the value of $185,000.00 which defendants had accepted in the option.
The record shows that defendants, immediately upon learning of the probable taking of their property, informed Crab-tree of the listing and option agreements, but specifically denied that plaintiff was to represent them in any manner in connection with the governmental “seizure” of the property, unless the listing or option contracts came into play. Moreover, when defendants later allowed the Corps’ appraisers on the property, they denied admission to plaintiff.
Admittedly, plaintiff did supply information and data to the Corps’ appraisers which possibly benefitted defendants. Nevertheless, Crabtree specifically testified that the field appraisers contacted several realtors in the area in connection with this appraisal (in addition to searching the public records), as they normally did in all appraisals, but that they consulted plaintiff only in his capacity as a realtor and that “our appraisers asked no more and received no more from Mr. Lambert as they ask or receive from any other realtor whether it be this job or any job.”
Plaintiff, had no express or implied contract to perform services on behalf of defendants in respect to the appraisal. Indeed, plaintiff normally supplied information to the appraisers as a courtesy, and there was not the slightest suggestion in the record' that the appraisal in this particular case was higher because of plaintiff’s services or would have been lower if the appraisers had relied only upon information from other realtors and research of the public records.
For these reasons, the judgment of the trial court is amended to delete the award of $500.00 for services on a quantum meruit basis. As amended, the judgment is affirmed. Costs of this appeal are assessed to plaintiff.

AMENDED AND AFFIRMED.

. Plaintiff concedes that no commission is due on the appropriation of the servitude.

. The part which plaintiff played in these evaluations will be discussed later in connection with another issue.

.See La.Const.1921, Art. 16, §§ 5 and 6.

. Crabtree testified that the appraisal of present mark value was not negotiable, although there are sometimes negotiations as to the price ultimately paid.

. Admittedly, since defendants had agreed in the option to sell the property for $185,000.00 minus a commission, the appropriation (even at $182,500.00) was to their financial advantage. Nevertheless, the appropriation also extinguished the contract (making it impossible to perform) before any sale under the contract could take place, and the contract was plaintiff’s sole basis for a commission.